[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 478 
THIS was a scire facias on a judgment obtained by confession in the Superior Court for Kent County, by the plaintiffs against Henry W. McIlvain, on the 19th of October, 1857, for $880.50 and costs, and came up upon a case stated and the question of law reserved for hearing before all the Judges in this court, and was as follows:
Thomas Catts the owner in fee of a tract of land in Murderkill Hundred, Kent County, containing about five hundred acres, on the 16th day of May, 1853, entered into an instrument of writing, of which the following is a copy, with Henry W. McIlvain in regard to the same: Know all men by these presents that I, Thomas Catts of the town of Milford, in the County of Kent and State of Delaware, am held and firmly bound to Henry W. McIlvain of Murderkill Hundred, in the County and State aforesaid in the sum of seven thousand dollars, lawful money of the United States of America, to be paid to the said Henry W. McIlvain, his certain attorney, executors, administrators or assigns, to which payment well and truly to be made I bind myself, my heirs, executors, administrators or assigns firmly by these presents. Sealed with my seal and dated this sixteenth day of May, in the year of our Lord one thousand eight hundred and fifty-three. Whereas, the said Thomas Catts hath granted, bargained and sold to the said Henry W. McIlvain two farms or tracts of land on St. Jones' Creek or Dover River, in the Hundred and County aforesaid, adjoining lands of Thomas Pickering, Bennett Dyer, and others, containing five hundred and ten acres, more or less of upland, marsh and cripple for the sum of seven thousand dollars, as per articles of agreement entered into by the said Catts and *Page 479 
McIlvain, a true copy whereof is herein inserted, as follows, to wit: the said Thomas Catts for and in consideration of the sum hereinafter mentioned, has bargained and sold to the said Henry W. McIlvain his two farms situated as aforesaid, and containing five hundred and ten acres more or less, for the sum of seven thousand dollars, the said Thomas Catts agrees to give the said Henry W. McIlvain an alienation bond for the same on the 16th inst.; the rents and profits of the said lands to belong to the said Catts until January 1st, 1854, and the said Henry W. McIlvain agrees to pay to the said Thomas Catts, his heirs or assigns for the said lands the sum of seven thousand dollars as follows: five hundred dollars on the 1st of January, 1854, five hundred dollars on the 1st of January, 1855, and the remaining six thousand dollars in six equal annual instalments thereafter with lawful interest from and after January 1st, 1854. For the true and faithful performance of all the above we bind-ourselves in the penal sum of one thousand dollars lawful money as aforesaid. In witness whereof we have hereunto set our hands and seals this ninth day of May, in the year of our Lord one thousand eight hundred and fifty-three. (Signed and sealed by the parties respectively.) And the said Thomas Catts further hereby binds himself, his heirs, executors and administrators that upon the payment by the said Henry W. McIlvain, his executors, administrators or assigns, of the said sum of seven thousand dollars with the interest to accrue thereon according to the above recited articles of agreement, to make, execute and deliver to the said Henry W. McIlvain, his heirs, or assigns a deed of conveyance conveying a title to all and singular the aforesaid lands and premises. Now therefore the conditions of the obligation first above written is such, that when the said Henry W. McIlvain, his heirs, executors, administrators, or assigns shall pay, or cause to be paid as aforesaid the said sum of seven thousand dollars with interest as aforesaid, then if the said Thomas Catts, his heirs, executors or administrators shall well and truly *Page 480 
make, execute and deliver to the said Henry W. McIlvain, his heirs or assigns a deed of conveyance as aforesaid, then the said obligation shall be null and void; otherwise to be and remain in full force and virtue. In witness whereof the said Thomas Catts hath hereunto set his hand and seal the day and year first above written. (Signed and sealed by Thomas Catts.) At the foot of the instrument were added the following postscripts: "It is also further understood and agreed to by the parties that Thomas Catts will deed any part of said land at any time the said Henry W. McIlvain may sell and pay over to the said Catts the amount of such sale, say at the rate of three thousand four hundred dollars for the upper farm, and three thousand six hundred dollars for the lower farm. As witness our hands and seals this 16th day of May 1853." (Signed and sealed by the parties thereto, Catts and McIlvain.) "1853, December 22d: This day with the assent and agreement of all parties, Thomas Catts executed and acknowledged a deed of bargain and sale for a portion of the above described premises to Thomas Pickering, containing about thirty-three acres adjoining said Pickering's other lands, the metes and bounds whereof are fully set forth in said deed of bargain and sale." (Signed by Henry W. McIlvain.)
Under the articles of agreement and alienation bond above mentioned, McIlvain went into possession of the lands by his tenant who occupied the same, and sold off at various times parcels thereof and paid the purchase money received therefor to Catts who made and delivered deeds for the parts so sold, to the respective purchasers of them, until the 3d day of September, 1857, when the said H. W. McIlvain entered into articles of agreement in writing with one William Daws of said county, by which he covenanted and agreed to sell and convey to the said Daws in fee simple clear of all incumbrances, all the residue of said lands, consisting of the lower farm before mentioned and containing two hundred and fifty acres, more or less, for which he was to pay five hundred *Page 481 
dollars on the execution of the agreement, six hundred dollars without interest on or before the third day of December ensuing, and on or before the day last mentioned, to convey by a good and sufficient deed of himself and wife a certain tract of land owned by him in said hundred and containing about ten acres and valued at three hundred dollars, to the said McIlvain, and on that day to execute to the latter or to any other person whom he might designate, a judgment bond and mortgage of the premises so contracted to be sold to him as aforsaid by the said McIlvain, to secure the payment of the residue of the purchase money therefor as follows, viz: five hundred dollars with interest on the whole of the residue of said purchase, that is to say, on the sum of four thousand four hundred dollars (the whole purchase money being five thousand eight hundred dollars,) on or before the 1st day of January, 1859, the further sum of seven hundred and fifty dollars with interest on the residue of the purchase money then unpaid, on or before the 1st day of January, 1860, the further sum of seven hundred and fifty dollars with interest as aforesaid, on or before the 1st day of January, 1861, the further sum of one thousand dollars with interest as aforesaid, on or before the 1st day of January, 1862, the further sum of one thousand dollars with interest as aforesaid, on or before the 1st day of January, 1863, and the remaining part of said purchase money, viz., the sum of four hundred dollars with interest as aforesaid, on or before the 1st day of January, 1864; and if either party thereto should fail to comply with the stipulations therein contained to be kept and performed on his part, he should pay to the other party the sum of five hundred dollars as the measure of the damages. And it was stipulated on the part of the said McIlvain by a postscript to the agreement that the said Daws should have entire possession of the premises on the first day of January ensuing.
No deed was ever executed by McIlvain to Daws for the said premises pursuant to this latter agreement; but *Page 482 
on the 1st day of January, 1858, Thomas Catts and his wife conveyed by deed of bargain and sale the land so sold, to Daws for the consideration of five thousand eight hundred dollars; and on the 1st day of March, 1858, Daws entered into possession of the same. At the foot of this deed from Catts and wife to Daws was an endorsement signed and sealed by McIlvain that it was made with his consent and approbation; and the same was made in fulfillment of his said agreement with Daws. On the execution of the agreement between them and pursuant to the stipulations of it, Daws paid to McIlvain five hundred dollars, and the further sum of five hundred dollars on the execution of the deed from Catts and wife to him for the premises and at the same time executed and delivered to him his judgment bond and mortgage of the premises to secure the payment of the four thousand eight hundred dollars, the residue of the purchase money agreed to be paid, a part of which has since been paid by him to McIlvain and the bond and mortgage assigned by him to one Bryan who now holds the same. At the time of the conveyance, however, of the land by Catts and wife to Daws as above stated, the whole consideration money of the purchase from Catts by McIlvain was not paid; on the contrary, a considerable amount thereof was outstanding and unpaid until the 10th day of January, 1860, when the sum of two thousand two hundred and thirty-six dollars and eighty-seven cents was made by a sale of the real estate of McIlvain by the sheriff of the said county and applied to the judgment of Thomas Catts v. Henry W. McIlvain, Number 18 to April Term 1853 in the Superior Court of the State in and for said county and which judgment was given by McIlvain to Catts to secure the purchase money for the land mentioned in the agreement between them, and a part of which was sold and conveyed to Daws as aforesaid. The sum of seven thousand dollars with interest thereon, being the sum which McIlvain contracted to give for the land, had been paid by him to Catts prior to the articles of agrement *Page 483 
entered into by him with Daws, with the exception of the sum of two thousand two hundred and thirty-six dollars and eighty-seven cents, which sum remained unpaid until the 10th day of January, 1860; and that such prior payments were made for the most part by the bonds of purchasers with whom McIlvain contracted for the sales of portions of said lands, but who took their deeds therefor from Catts. It was also a fact that in addition to the possession of the land by a tenant of McIlvain as before stated in the case, McIlvain on sundry occasions between the date of the agreement between him and Catts and of the agreement between him and Daws, entered on the said lands and cut fence rails and posts for the use of his other lands. But no part of the purchase money for the land sold by McIlvain to Daws was applied to the payment of the seven thousand dollars, the consideration money to be paid to Catts by McIlvain under his agreement with him; but the said sum of seven thousand dollars was paid to Catts as before mentioned.
Previous to the said articles of agreement entered into between the said Henry W. McIlvain and the said William Daws for the sale by the former to the latter of the residue of said lands as aforesaid, that is to say, on the 19th day of October 1857, the plaintiffs in this case stated, the said John Flanagin Sons obtained a judgment in the said Superior Court for the county aforesaid, against the said Henry W. McIlvain for the real debt of eight hundred and eighty dollars and fifty cents with stay of execution thereon for one-half of said debt until the 1st day of April, 1858, and for the residue of the said debt until the 1st day of October, 1858, on which a writ of scirefacias was afterward sued out by the said plaintiffs against the said H. W. McIlvain and ter-tenants, on the 20th day of October, 1860, returnable to the October Term 1860 of the said court and at which term the same was returned by the sheriff of the said county, made known personally to the said Henry W. McIlvain, the defendant, and to the said William Daws, the defendant in *Page 484 
this case stated, among others as ter-tenants; no process of execution having in the meantime been issued on the said judgment.
On the foregoing statement of facts the following question of law was reserved for a hearing before all the Judges in the Court of Errors and Appeals: On the foregoing facts, is the land so conveyed to the said William Daws, subject to be taken in execution on the foregoing judgment of John Flanagin Sons against Henry W. McIlvain? If the Court shall be of opinion that it is so subject, then judgment on the scire facias to be entered for the plaintiffs; otherwise, for the defendant.
The question reserved in this case, for the consideration of the court is, whether the land conveyed by Thomas Catts and wife, to William Daws, on the 1st of January, A. D., 1858, is subject to be taken in execution, under the judgment recovered by John Flanagin Sons against Henry W. McIlvain on the 19th day of October, A. D., 1857. In other words, whether the said judgment became a lien on that day upon the equitable interest or estate which McIlvain had in the land, at the time of the rendition of the judgment against him, which, it will be observed, was prior to the date of the conveyance of Catts and wife to Daws. It is to be remembered, that this is not the case of an active trust, where the interest of the cestui que trust, is sought to be affected. Of course, in such a case, the judgment would not be a lien, nor would there be any remedy at law. But the case of an active trust differs most materially, from the case now under consideration.
The statement of facts agreed upon, discloses the case of a written contract for the sale and conveyance of land, by Thomas Catts to Henry W. McIlvain, for the sum of seven thousand dollars, payable by instalments, with interest, — Catts binding himself, upon payment of the purchase money, according to the terms of the contract, to convey the land to McIlvain in fee simple. Under this contract, and according to its terms, McIlvain went into, and continued in the actual possession of the land, and had paid to Catts, prior to the conveyance of the latter to Daws, upwards of two-thirds of the amount of the purchase money, with its interest, leaving a balance of only $2,236.87 of the purchase money and interest unpaid; which balance was amply secured to Catts by McIlvain, by judgment liens on other lands of the latter; and this balance, since the conveyance to Daws, has in fact been levied and made, out of those other lands. *Page 491 
It is perfectly obvious, therefore, that at the date of the entry of the judgment of Flanagin Sons, McIlvain had acquired an equitable interest in the land in question, to at least, the extent of the amount of the purchase money which, up to that time, had been paid by him; and, as McIlvain had actually paid upwards of two-thirds of the purchase money up to that time, it would seem to follow, that his interest in the land, must have been equal in value to at least, two-thirds thereof. It has been said, that Daws entered into a written agreement with McIlvain for the purchase of the land in question, prior to the entry of Flanagin Son's judgment, and that as a consequence, there exists an equity in his favor. This is true, so far as the fact of the agreement is concerned. But does the alleged consequence follow? It is equally true, that he was conversant with the terms of the contract between Catts and McIlvain, for in his own agreement, he expressly refers to the terms of that contract. And for upwards of two months, before he accepted the conveyance of the land from Catts, he had at least legal or constructive notice of the entry and existence of Flanagin Son's judgment, for he was bound to take notice of the condition of the record. We are at a loss, therefore, under the circumstances, to discover any equity in his favor, against Flanagin Son's judgment. He acted throughout with his eyes open. We are also at a loss to perceive the existence of any equity, in favor of Catts, because he was not only well secured at the time, for the balance of the purchase money, on other lands belonging to McIlvain, but by conveying the land in question to Daws, and knowingly, permitting Daws to execute a mortgage to McIlvain, for the purchase money, he released any equitable claim or lien, which he might otherwise have had against the land for the balance of the purchase money then due to himself from McIlvain.
It is true, in England at common law, a judgment was not a lien on an equitable estate. By the statute 29th Charles II, it was made liable to be taken in execution; *Page 492 
but then, the lien on the land was effected by the issuing of the writ, and not by force of the judgment. But, apart from the ancient rule of the English common law, adopted in favor of the policy of feudal tenures, and in restraint of alienation, can there be, on principle, any valid reason assigned, why a judgment should not be a lien on an equitable estate? At common law, too, lands were not liable to be taken in execution for payment of debts. But this doctrine is now repudiated everywhere. And in this State, the "counties of New Castle, Kent, and Sussex, on Delaware," as they were formerly called, the policy of our laws, from the origin of the Government, has been, to favor alienation of estates, and at the same time, to protect and enforce the rights of creditors; and our. legislation shows, there never was a time, in the "three lower counties" when lands were not liable to be taken in execution for the payment of debts.
Now, the question propounded to us for decision is, whether this equitable interest or estate of McIlvain's whichever it be called, was bound by the lien of Flanagin Son's judgment? We think this question must be answered in the affirmative. And, therefore, we hold that it was so bound, notwithstanding the contract between McIlvain and Daws, and the conveyance of the land to Daws by Catts; and that Daws took the land subject to the lien, and of course, liable to be taken in execution under the judgment. In order to show that this conclusion is sound, it is but proper to advert briefly, to our early history. On the 4th day of March, 1680, William Penn, by Letters Patent under the great Seal of England, granted by Charles the II, acquired title to the Province of Pennsylvania; and on the 24th day of August, 1682, by two several deeds of feoffment from James, Duke of York, he obtained title to the "three lower counties on Delaware", being the territories now constituting the State of Delaware. By the act of Union, for annexing the three lower counties to the Province of Pennsylvania, dated the 10th of December, 1682, it is provided that *Page 493 
"the counties of New Castle, Jones and Whorekills' alias New Dale, (as they were then called) shall be annexed to the Province of Pennsylvania, as the proper territory thereof; and that the people therein shall be governed by the same laws, and enjoy the same privileges in all respects as the inhabitants of Pennsylvania do." The first General Assembly of the representatives of the freemen of the Province of Pennsylvania and of the three lower counties on Delaware, met at Upland, alias Chester, in Pennsylvania, in the year 1682, and among their laws at that session, we find it enacted that "all lands and goods shall be liable to pay debts, except where there shall be legal issue, and then all the goods and one-half of the land only, unless the land was bought before the debts were contracted." In the year following, we find another law, declaring that whatsoever estate any person hath in this province or territories thereof, at the time of his death, shall be thus disposed of — one-third to this wife, one-third to the children equally, and the other third as he pleaseth, and in case his wife be deceased before him, two-thirds to the children equally, and the other third to be disposed of as he shall see fit, his debts being first paid. By another law passed in the year 1688, after stating in the preamble, that forasmuch as by a law made at Upland all lands were made liable to pay debts, with such restrictions and limitations as are therein expressed, for the fuller and more satisfactory explanation and alteration of the same, it was enacted that "all lands whatsoever, and houses, shall be liable to sale upon judgment and execution obtained." This law was temporary in its character, and expired by the terms of its own limitation. It was to continue for one year, and until the rising of the then next General Assembly, and for twenty days thereafter, and no longer. It evidently referred to the law of 1682 on the same subject. Again, in the year 1694, the Governor, by and with the advice and consent of the General Assembly, passed another law containing precisely the same preamble and enacting that "all lands whatsoever, *Page 494 
and houses," should be liable to sale upon judgment and execution. This act was without limitation as to duration. Then, in the year 1700 we find another law, by which, after reciting, that, to the end that no creditors may be defrauded of the just debts, due to them by persons of this province or territories who have sufficient real estate, if not personal, to satisfy the same, it is again enacted that "all lands and houses whatsoever, within this government, shall be liable to sale upon judgment and execution obtained against the defendant, the owner, his heirs, executors or administrators, where no sufficient personal estate is to be found." "All lands whatsoever" — "all lands and houses whatsoever." Did not the makers of these laws intend that they should have a very comprehensive application? Is it not manifest that they intended to include and subject to execution and sale, every description of estate or interest legal or equitable, which a person might have in lands or houses, except where the same was the subject of an active trust ? Can it be said that this is a forced construction of these laws, when we consider the very informal and imperfect character of contracts in relation to, and conveyances of, lands, during the early settlement of these counties, and when we remember, too, that there was as yet, no court of chancery, or other court exercising equity power, in existence? Indeed, it is not too much to say, that this view of the subject seems to be strengthened, if not confirmed, by an act passed in the year 1721, in which it is declared, that "divers laws have been enacted in this government that made all lands and tenements, without any regard to the fee simple "or other tenure by which they are held, as liable to pay debts as chattels, and to be taken and sold upon executions."
Now, it is proper to observe, that all these laws applied equally to the province of Pennsylvania and to the three lower counties. They were subject to one and the same propriety government, the same legislature, to the same laws, and to the same judicial system, up to and *Page 495 
including the year 1701. In the month of October of the year last named, however, a difficulty arose in the General Assembly, in regard to the proposed confirmation of certain laws which had been passed the year before at New Castle; and although many attempts were made by the Deputy Governors and Council, to reconcile the difficulty, and to perpetuate the union of the legislative branch of the government, they all ended in failure. The last attempt at reconciliation was made in the month of April 1704. After which, the members from the three lower counties finally withdrew from the union; and from this time forth, the freemen of the three lower counties, with the consent of Mr. Penn, as provided for in the charter of privileges, had a separate and independent legislature of their own. The judiciary system, however, remained the same, until some time between the years 1726, and 1736. The laws subjecting lands to sale for the payment of debts, remained the same, and have so continued up to this day. And indeed, the general legislation of the province of Pennsylvania, and of the three lower counties, continued to be almost identical up to the time of the Declaration of Independence in 1776. But at some period between the years 1726, and 1736, probably about the year 1732, the General Assembly of the three lower counties, authorized the county court of Common Pleas, a common law court, composed of Justices of the Peace of the several counties, to hold courts of equity. We have here, then, a period of about fifty years, during which there existed no court in these counties, vested by law with equity jurisdiction. And, it follows, as a matter of course, that up to this time the administration of justice in these counties, must have been according to the forms of the common law. Within these counties, a judgment recovered before the proper tribunals for the purpose has always been held to be a lien upon real estate. Our earliest legislation shows this. Can it be supposed then, for an instant, that there ever was a time when there existed no remedy anywhere, for enforcing payment of a *Page 496 
judgment out of an equitable estate? We know that for a period of about fifty years there was no court of equity to which resort could be had. If, therefore, there existed at that day under our then system any remedy whatever in such a case, it could only be found in the courts of common law, and through the instrumentality of common law forms. And although it is true, that the legislature, after the lapse of the period just mentioned, did confer equity powers on the Justices of the court of Common Pleas; yet it is quite manifest from the record of their proceedings that they did not exercise a general equity jurisdiction, but on the contrary, confined themselves almost entirely, if not exclusively, to injunctions for staying suits" at law, and stopping waste, the perpetuating of testimony, and in establishing the boundaries of lands. This state of things continued, so far as we have any knowledge, up to the time of the adoption of the constitution of 1792, for the constitution of 1776 had made no material change in the equity jurisdiction. It merely provided that "`the Justices of the courts of Common Pleas and Orphans' Courts shall have the power of holding inferior courts of chancery as heretofore, unless the legislature shall otherwise direct." The constitution of 1792 created a court of chancery, and the office of Chancellor. The 14th section of the 6th article provided that "the equity jurisdiction heretofore exercised by the Judges of the Court of Common Pleas, shall be separated from the common law jurisdiction, and vested in a chancellor, who shall hold courts of chancery in the several counties of this State." An equitable interest, such as McIlvain's, is not a mere chattel interest. It would not go to executors in case of his decease; it is an inheritable interest, and would descend and pass, to his heirs at law, subject to dower, according to the order prescribed by our intestate laws. In all respects, under our system, it is treated and disposed of as real estate. Our statute of February 5th, 1827, expressly declares, that, "when any person having title, or any manner of right, legal or *Page 497 
equitable, in any lands, tenements or hereditaments in fee simple, shall die intestate as to the same, such lands, tenements or hereditaments shall descend and pass in fee simple to the kindred male and female of the intestate in coparcenary." And this has always been the law in these counties. In Pennsylvania, under precisely the same laws, for the sale of lands for the payment of debts, and under a similar judicial system during a large portion of our history, it was always held that a judgment was a lien on an equitable interest such as this, and that all possible titles, equitable, contingent or otherwise, were subject to sale upon judgment and execution. 1Yeates 427. 2 Yeates 25. 2 Bin. 91. 3 Bin.
49. 16 Serg. 431. 5 S. R. 129. 8 S. R.
440-1. 2 Watts 10, 15, 16. 8 W. S. 186.Stephen's Appeal, The doctrine established by the courts of Pennsylvania, as we understand it, is not based, in any respect, upon the 29 Charles II, but grew up under their own system of laws. And we think the same doctrine should be held to prevail in this State, at least, so far as equitable interests of this character are concerned. Of course the purchaser at sheriff sale, would take the land subject to such equities as might exist in favor of the original vendor, in respect to any balance of unpaid purchase money. Such purchaser would be subrogated as to the right and interest of the original vendee, and would stand in his shoes. He would take the interest of the original vendee, no more and no less.
It has been contended by the counsel for the defendant, that, if there be any remedy at law here, to recover a debt out of an equitable interest in lands, it must be by force of chapter 2, section 3,of statute 29, Charles II, which gives a lien to the writ of execution, but not to the judgment under which it was issued; and that, according to the construction given to the statute, if the trustee had conveyed away the lands by the direction of the cestuique trust, before execution sued, they could not be taken in execution; and that consequently in this case no writ of execution having been issued and the lands *Page 498 
having been conveyed away, the judgment creditors are without remedy at law against them. Now it might be a sufficient answer to this suggestion, to say, that section 3, of chapter 2, of the English statute, has never been held to be in force in Pennsylvania or in Delaware. It is true that statute 29, Charles II,
was enacted prior in time to the grants made to William Penn. But when we remember that it is a well settled principle in regard to colonization, that the emigrants from the mother country carry with them only such laws or parts of such laws, as are deemed useful and adapted to the exigencies of their new situation, the fact that the provision of the statute just referred to, has not been recognized here, as a part of our law, is satisfactorily accounted for; more especially, as they established from the beginning of our Colonial history, as they had a right to do, an independent system of their own, for enforcing the payment of debts. *Page 499